# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. JASPER PUGH

**Appeal from the Circuit Court of Madison County**
**No. 10-646     Donald H. Allen, Judge**

**No. W2011-02496-CCA-R3-CD  - Filed November 2, 2012**

Jasper Pugh ("the Defendant") was convicted after a jury trial of two counts of theft of property of $1,000 or more but less than $10,000. After a sentencing hearing, the trial court sentenced the Defendant as a career offender to twelve years on each count. The trial court ordered each count to run consecutively, for an effective sentence of twenty-four years. The Defendant appeals, challenging the sufficiency of the evidence for both counts and the trial court's imposition of consecutive sentences. Upon our thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Gookin, Assistant District Public Defender, Jackson, Tennessee, for the appellant, Jasper Pugh.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

The Defendant was indicted on two counts of theft of property of $1,000 or more but less than $10,000[1] on October 4, 2010. According to the indictment, count one pertains to the theft of a 1993 Chevrolet vehicle owned by Shanta Jones, and count two pertains to the theft of a 1996 Buick vehicle owned by Rocco Larry.[2] The Defendant proceeded to a jury trial on the indicted offenses on May 19, 2011.

Rocco Larry testified that he owned a 1996 Buick Century automobile which was stolen from a parking garage at Baptist Memorial Hospital ("Baptist") in Memphis, Tennessee, on August 22, 2009. Specifically, Larry testified that on August 22, 2009, the date the theft occurred, he was in Memphis, Tennessee, visiting his brother at Baptist. Larry explained that he had traveled from Texas, where he lived, to Memphis, Tennessee, in his Buick to visit his brother who was a patient at Baptist. Larry testified that on August 22, 2009, he parked his Buick in the Baptist parking garage in "disabled parking" because he was with his mother, who was disabled. After parking his Buick, Larry and his mother visited with his brother at Baptist for approximately one hour. When he returned to the parking garage, his Buick "was gone." Larry went to Baptist security and reported that his Buick had been stolen. According to Larry, a lieutenant with Baptist security called the Memphis Police Department ("MPD"), and the MPD subsequently "[t]ook a report" from him.

Later that evening, on August 22, 2009, the Jackson Police Department ("JPD") notified Larry that his Buick had been recovered in Jackson, Madison County, Tennessee. Two days later, Larry went to Jackson to retrieve his Buick. The Buick the JPD recovered was his vehicle, but there "was a hole just below the lock on the driver's side" and the "steering column was broken."

---

[1] The Defendant's indictment for the two counts of theft in this case reads "theft of property equal to or over the value of one thousand dollars ($1,000.00)." Throughout this Opinion, we will refer to the statutory language for this classification of theft which is contained in Tennessee Code Annotated section 39-14-105(3) (2006): "[t]heft of property . . . one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)."

[2] The victim named in count two of the indictment is "Larry Rocco." However, at trial this individual testified that his first name is "Rocco" and his last name is "Larry." He further testified that people often confuse his first and last name and believe that his first name is "Larry."

According to Larry, he did not give anyone permission or consent to take his Buick. He purchased the Buick in 2007 for approximately $7,000 and stated that it was "probably [worth] about $3,500" on August 22, 2009.

Shanta Jones testified next. She owned a blue 1993 Chevrolet truck[3] which was stolen from the Popeye's restaurant on Vann Drive in Jackson, Madison County, Tennessee, on August 22, 2009. Specifically, Jones testified that on the date of this incident, she went to work at Popeye's at 2:00 p.m. She explained that she went outside at 4:00 p.m., two hours later, and her truck "had vanished." She immediately reported this to the JPD. Directly next to the parking spot where she had parked her now-missing truck was a four-door, burgundy or red car. She explained that "the fan was running or something was running on it." It was later discovered that this vehicle belonged to Larry.

Jones testified that her truck was recovered on the same day, August 22, 2009, at the "29 mile marker in Fayette County[]." Jones traveled to Fayette County later that evening to retrieve her truck. After examining the truck, Jones determined that it was in fact her truck, but she noticed that there was no gas in the truck, "the transmission was messed up," "[i]t would crank, but it wouldn't go in gear," the "steering column was popped," and the "right [passenger] door handle was broken into." As a result, she had to get her truck towed.

According to Jones, she did not give anyone permission to take her truck. She purchased the truck for $3,500 approximately six or seven months before it was stolen.

Kenneth Reeves , a police officer with the JPD, testified that on August 22, 2009, he was called to assist Officer Harvey with a stolen vehicle report at Popeye's on Vann Drive in Jackson, Tennessee. Upon Officer Reeves' arrival, Jones reported to him that her vehicle had been stolen and showed the officers where it had been parked. Officer Reeves explained that next to the empty parking spot where Jones' now-missing truck had been parked was a maroon Buick. The Buick's motor was running, but it was unoccupied and the windows were down. Officer Reeves explained that "[t]he whole time we're standing there talking to the victim, nobody ever came to the vehicle, so we kind of started looking at it a little bit." He noticed that there was "damage to the lock on the driver's door and damage on the steering column." Additionally, the plastic covering around the steering column had been broken away and there was damage to the ignition switch. According to Officer Reeves, this was consistent with a vehicle that had been stolen. Additionally, although the vehicle was running, there were no keys in it.

---

[3] The indictment in this case indicates that the stolen vehicle which belonged to Jones was a 1993 Chevrolet. At trial, Jones testified that her truck was a blue, two-door truck. However, she believed it to be "about a '97" and said she thought "it was a Ford." But, Jones did state that she "wasn't good with the make and models. I just drove."

After noticing the damage to the vehicle, Officer Reeves and Officer Harvey "ran the tags and it came back to Mr. Rocco Larry out of Arkansas."[4] At this point, the Buick had not been reported stolen. Officer Reeves testified that he and Officer Harvey entered the vehicle and "did a little closer search trying to see if we could find out any contact information regarding the owner." They also began performing a "CST"[5] on the vehicle because they "figured it may have been stolen[]."

Officer Reeves next explained that he checked the Buick for latent fingerprints. He does not check an entire vehicle for latent fingerprints but instead restricts it to certain areas because it has "to be a very smooth surface" in order to lift latent fingerprints. He further explained that he looks "at areas that are commonly touched, the door handles, around the door handles, around the edge of the door, on the glass and areas like that." Thus, he only checked the exterior of the Buick on the doors for latent fingerprints. He did not attempt to recover latent fingerprints from the interior of the Buick because the interior "is textured areas."

Officer Reeves testified that he performed three latent fingerprint lifts from the exterior doors of the Buick and placed the recovered latent fingerprint lifts on three "cards." On each of the cards, he described the location from which each latent fingerprint lift was recovered. Two latent fingerprint lifts were recovered from the front driver side door of the Buick, and one latent fingerprint lift was recovered from the front passenger side door of the Buick.

On cross-examination, Officer Reeves acknowledged that he did not take any photographs of the damage he observed to the Buick. He also testified that the Buick was initially "listed as an abandoned vehicle and was towed by a local wrecker service and secured at their lot." Officer Reeves explained that "it was a delayed hit on the information around the vehicle that it was reported stolen."

William Roane, a forensic latent fingerprint examiner with the JPD, testified as an expert witness in the field of fingerprint identification and analysis. Roane testified that he analyzed the latent fingerprint lifts recovered by Officer Reeves as part of the JPD investigation. He determined that there were "four latent [finger]prints of valuable identification purposes on [the] three lifts." He "plotted the points that [he] found in the

---

[4] During Larry's testimony at trial, he explained that he previously lived in Arkansas, but had recently moved to Texas to care for his mother. He stated that his car was still registered in Arkansas because he "never had a chance to change [his car] tags over."

[5] Officer Reeves explained that "CST" means "crime scene stuff. Checking for latent prints."

latent [finger]print[s]"[6] and submitted two of the plotted latent fingerprints to the FBI for comparison in the FBI's IAFIS system, a database that contains over eighty million sets of fingerprint cards. Roane explained that the FBI returned ten "respondents" from its IAFIS system that closely matched the plotted fingerprints. Roane then compared the four latent fingerprints recovered from the Buick with the ten respondents' fingerprint cards he received from the FBI, and he determined that two of the latent fingerprints belonged to a respondent "by the name which was in the FBI files as Jasper Marquis Simmons, FBI #259871ABO."[7] One latent fingerprint recovered from the Buick's front driver side door handle was identified as the left thumb of Jasper Marquis Simmons. One latent fingerprint recovered from the Buick's front driver side door above the door handle was identified as the right index finger of Jasper Marquis Simmons.

Roane then requested that an investigator take original fingerprints from Jasper Marquis Simmons and submit those prints to him. After this request, Aubrey Richardson, investigator for the JPD, submitted a copy of an ink fingerprint card to Roane bearing the name "Jasper Marquis Pugh," which was faxed to Investigator Richardson from the MPD. Roane explained that he then checked the JPD's files to determine whether the JPD had a fingerprint card on file for Jasper Marquis Pugh. He determined that the JPD did have a fingerprint card on file for Jasper Marquis Pugh, and he retrieved this fingerprint card from the ink fingerprint files maintained at the JPD. Roane then compared the two latent fingerprints that he previously was unable to identify using the ten respondents' fingerprint cards he received from the FBI, both of which were recovered from the Buick's front passenger side door handle, with the Jasper Marquis Pugh ink fingerprint card from the JPD. He determined that both of these latent fingerprints matched the right thumb of Jasper Marquis Pugh's ink fingerprint card from the JPD.

Roane testified that he was able to identify all four of the latent fingerprints as the Defendant's because each of the four latent fingerprints matched the Jasper Marquis Pugh ink fingerprint card from the JPD. Accordingly, Roane concluded that "Jasper Marquis Pugh, J.P.D. #23674 [JPD ink fingerprint card], and Jasper Marquis Simmons, F.B.I. #259871ABO [FBI fingerprint card from the IAFIS system], are the prints of the same individual."

---

[6] Roane explained what plotting entails: he scans the latent fingerprints onto a computer at the JPD, and he then marks the ridges, bifurcations, enclosures, and dots on the uploaded latent fingerprints so that he can electronically submit the plotted fingerprints to the FBI for comparison in its IAFIS system.

[7] Although the FBI's file stated the name "Jasper Marquis *Simmons*" (emphasis added), Roane later determined that Jasper Marquis Simmons was the same person as Jasper Marquis Pugh. See infra p. 5.

On cross-examination, Roane acknowledged that he never received any latent fingerprints collected from the interior of the Buick in this case. He further acknowledged that latent fingerprints can be recovered from the interior of vehicles. He noted, however, that more latent fingerprints are found on the exterior of vehicles than on the interior of vehicles, because the interior of vehicles "contain[] items or surfaces that will not hold a latent print."

Investigator Richardson testified that in August 2009 he worked in the auto theft unit and was assigned this case. The day the incident occurred, Investigator Richardson testified that he did not go to Popeye's but was contacted by Officer Reeves who advised him "of the situation." Investigator Richardson further explained that he talked to the dispatchers on the date the thefts occurred, after Jones' truck was recovered outside of their jurisdiction, and "kind of coordinated the efforts for her to go retrieve her vehicle which was recovered."

Investigator Richardson testified that when Roane informed him that two of the latent fingerprints recovered from the Buick were identified as belonging to an individual named "Jasper Simmons," as identified in the FBI IAFIS system, he "looked at the local database" to determine who that person was. Investigator Richardson explained that

> it was kind of apparent when you first started looking at it, based on the Social Security number, the date of birth and the address, Jasper Simmons and Jasper Pugh all had the same entries in our system and it appeared it was indeed the same person which is what Mr. Roane confirmed for us.

Investigator Richardson accessed a secure database website for the State of Tennessee called the Criminal Justice Portal, which contains driver's license records for everyone in the State of Tennessee who has a driver's license. He printed out a driver's license record for Jasper Pugh, and this document was admitted as an exhibit. This document reflected the Defendant's residence as Memphis, Tennessee. Investigator Richardson also testified that the picture on the driver's license record for Jasper Pugh is the same person he identified in the courtroom as Jasper Pugh, the Defendant.

The Defendant presented no proof.

Following deliberations, the jury convicted the Defendant of two counts of theft of property of $1,000 or more but less than $10,000[8] and imposed a fine of $3,500 on each count.

At the sentencing hearing held later, the Defendant presented no proof and did not make a statement. The presentence report was admitted as an exhibit without objection. The trial court sentenced the Defendant as a career offender to twelve years on each of his convictions for theft of property of $1,000 or more but less than $10,000, Class D felonies.[9] It ordered the sentences to run consecutively, for an effective sentence of twenty-four years, to be served at the Tennessee Department of Correction. The trial court also ordered the Defendant to serve this twenty-four year sentence consecutively to two prior sentences.[10]

In this appeal, the Defendant challenges the sufficiency of the evidence supporting both convictions, as well as the trial court's order that he serve his sentences for the instant convictions consecutively to one another.[11]

## Analysis

### Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence supporting his convictions. Our Rules of Appellate Procedure provide that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson

---

[8] We note that the Defendant properly could be charged with theft in Madison County under Count 2 of the indictment based upon the fact that the proof demonstrated that the Defendant "exercise[d] control over [Larry's] property" in Madison County even though he obtained the vehicle in Shelby County.

[9] See Tenn. Code Ann. §§ 39-14-103, -105 (2006).

[10] The record indicates that the trial court ordered that the twenty-four year sentence be served consecutively to a two-year sentence that was imposed by the Madison County Circuit Court in case number 10-34 and consecutively to another two-year sentence that was imposed by the Shelby County Criminal Court in docket number 10-03263.

[11] Although the trial court also ordered the Defendant to serve the instant twenty-four year sentence consecutively to two prior sentences, see supra note 10, the Defendant did not raise this as an issue. Thus, we will not address it.

v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. Id. Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id.

This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id. The jury decides the weight to be given to circumstantial evidence. Id. at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). Additionally, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Id. at 379 (citing Rice, 184 S.W.3d at 662 (quoting Marable, 313 S.W.2d at 457)). This Court "may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases." Id. (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)).

*Theft of Property*

The Defendant was convicted of two counts of theft of property of $1,000 or more but less than $10,000. Our criminal code provides that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2006). Our criminal code further provides that theft of property is a "Class D felony if the value of the property . . . obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)." Tenn. Code Ann. § 39-14-105(3) (2006).

We conclude that the proof is sufficient to support the jury's verdicts on both counts. Larry testified that his Buick was stolen from Baptist in Memphis, Tennessee. His Buick was recovered later that day at Popeye's in Jackson, Tennessee. He also testified that he purchased his Buick for $7,500 but that it was probably worth $3,500 on the day it was

stolen. Jones testified that her truck was stolen from the parking lot at Popeye's in Jackson, Tennessee. Her truck was recovered later than evening at mile marker 29 in Fayette County, Tennessee. She testified that she purchased her truck for $3,500 approximately six to seven months earlier. Both victims testified that no one had consent to take their vehicles. The locks on both vehicles had also been broken, and the steering column in both vehicles had been "popped" or broken.

Nevertheless, the Defendant contends that the proof is not sufficient to support his identity as the perpetrator. In essence, in support of this contention, the Defendant asserts that his theft convictions should be reversed and dismissed because of the lack of direct evidence. Specifically, the Defendant argues the following:

> In the instant case, it is apparent that [the Defendant] was convicted due to William Roane's opinion testimony regarding the fingerprint evidence lifted from Mr. Rocco Larry's vehicle. However, it could not be stated as to when and how [the Defendant's] fingerprints may have gotten on the vehicle, and there exists absolutely no evidence showing that [the Defendant] was ever inside Mr. Larry's vehicle. Similarly, the State can point to no evidence showing that [the Defendant] was involved in any way in the theft of Ms. Shanta Jones' truck. Taken as separate events, Ms. Jones could only state that her vehicle was taken from her place of employment and was retrieved in Fayette County, Tennessee.

> Moreover, as no witness could testify that they ever saw [the Defendant] in possession of either vehicle, there exists only a vague nexus linking [the Defendant] to either vehicle theft. For these reasons, [the Defendant] respectfully submits that the paucity of any direct evidence should give this Court a basis to reverse and dismiss [the Defendant's] two convictions for Theft of Property Over $1,000.

We acknowledge that the proof in this case is not overwhelming. However, under our standard of review, we hold that it is sufficient to establish the identity of the Defendant as the perpetrator of both the theft of Larry's Buick and the theft of Jones' truck.

The proof at trial revealed that the Defendant was a resident of Memphis, Tennessee. Larry testified that he lived in Texas and traveled to Memphis, Tennessee, to visit his brother at Baptist. Larry parked his Buick in the parking garage at Baptist on August 22, 2009, and went inside to visit his brother for approximately one hour. Upon returning to the parking garage, his Buick "was gone." He did not give anyone permission or consent to take his Buick. Larry reported it stolen, and the JPD notified him that his Buick had been recovered

in Jackson, Tennessee. The testimony established that Larry's Buick was abandoned at Popeye's in Jackson, Tennessee, on the same day it was stolen, August 22, 2009.

The proof at trial also established that Jones' truck was stolen from the parking lot of Popeye's in Jackson, Tennessee, some time between 2:00 p.m. and 4:00 p.m. on August 22, 2009. Jones testified that she parked her truck at Popeye's at 2:00 p.m. and that at 4:00 p.m, she went outside and discovered that her truck was missing. Directly next to her parking spot was Larry's Buick which had been stolen in Memphis earlier that day. Jones' truck was recovered later than evening at mile marker 29 in Fayette County, Tennessee.[12] Although Jones' truck was operable when she drove it to work earlier that afternoon, when she went to retrieve it, she had to get it towed because "it wouldn't go in gear."

Furthermore, Officer Reeves testified that he recovered latent fingerprints from the Buick in the parking lot of Popeye's. All four latent fingerprints that were recovered from the Buick matched the Defendant's fingerprints.

Tennessee law provides that a criminal offense may be established *exclusively* by circumstantial evidence. See Dorantes, 331 S.W.3d at 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973) and Marable, 313 S.W.2d at 456-58). Additionally, although circumstantial in nature, fingerprint evidence alone may be sufficient to support a conviction. See, e.g., Jamison v. State, 354 S.W.2d 252, 255 (Tenn. 1962); State v. Johnson, No. M2010-02664-CCA-R3-CD, 2012 WL 1648211, at *6 (Tenn. Crim. App. May 10, 2012); State v. Evans, 669 S.W.2d 708, 710 (Tenn. Crim. App. 1984). The weight to be given such evidence is for the jury's determination. Evans, 669 S.W.2d at 710 (citations omitted).

With regard to fingerprint evidence, a suspect's access to the examined object is also highly relevant. See, e.g., State v. Rowe, No. M2009-01423-CCA-R3-CD, 2011 WL 766943, at *3 (Tenn. Crim. App. Mar. 4, 2011) ("[T]he record is devoid of any evidence, '[a]side from idle speculation,' to suggest an innocent reason for the appellant's fingerprint to be in the box office.") (citation omitted); State v. Toomes, 191 S.W.3d 122, 131 (Tenn. Crim. App. 2005) ("[T]he accessibility of a defendant to the examined object is highly relevant because it could suggest an innocent reason for a defendant's fingerprints to be on an object."); State v. Richmond, 7 S.W.3d 90, 92 (Tenn. Crim. App. 1999) ("[W]e believe that the evidence in the present case shows sufficient inaccessibility. . . . Aside from idle speculation, nothing indicates an innocent reason for the defendant's fingerprint to be on the candy jar."); Evans, 669 S.W.2d at 710 ("[W]e point out that the record contains no evidence

---

[12] Although no evidence specifically was presented that mile marker 29 is located somewhere between Jackson, Tennessee, and Memphis, Tennessee, on Interstate 40, the Court takes judicial notice of this fact pursuant to Tennessee Rules of Evidence 201.

that could reasonably be said to show that the defendant's fingerprint could have gotten on the microfilm box in some innocent manner.").

In this case, the Defendant's fingerprints were recovered from Larry's stolen Buick where the car was found in Jackson, Tennessee. The proof established that Larry lived in Texas and had only been in Memphis, Tennessee, to visit his brother. Given the fact that Larry lived in Texas and had only been in Memphis, Tennessee, for a short period of time, it is reasonable to infer that there was no innocent reason for the Defendant's fingerprints to be on both the Buick's front driver side door and the Buick's front passenger side door. Thus, it is reasonable to infer that the Defendant stole Larry's Buick from the Baptist parking garage in Memphis, Tennessee, and abandoned it in the parking lot of Popeye's in Jackson, Tennessee. Moreover, it is also reasonable to infer that, after stealing Larry's Buick from Memphis and abandoning it at Popeye's in Jackson, the Defendant then stole Jones' truck from the Popeye's parking lot because her truck was parked directly next to the stolen, abandoned Buick. Moreover, because Jones' truck was recovered at mile marker 29 in Fayette County, Tennessee, which is located between Jackson, Tennessee, and Memphis, Tennessee, it is also reasonable to infer that the Defendant began driving the stolen truck back to Memphis until it became inoperable.

We conclude that this evidence is sufficient to identify the Defendant as the perpetrator of both thefts. Accordingly, the Defendant is entitled to no relief on this issue.

## Sentencing

The trial court sentenced the Defendant as a career offender to twelve years on each count in this case to be served in the Tennessee Department of Correction. The trial court also ordered that the Defendant's twelve-year sentences run consecutively based upon his extensive criminal record. The Defendant contends that the trial court erred on this issue. Specifically, although the Defendant "concedes his lengthy felony and misdemeanor history" and that he is a career offender, he argues the following in support of the imposition of concurrent sentencing:

> [B]y imposing concurrent sentences of twelve (12) years at 60% parole eligibility, the trial court could have fulfilled the goals of sentencing while simultaneously providing an appropriate punishment for [the Defendant]. Absent strong proof of his guilt, [the Defendant] submits that his punishment was unduly harsh and asks this Court to order that his sentences be served concurrently.

-11-

On appeal, when the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Susan Renee Bise, __ S.W.3d ___, ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at __, *20. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In analyzing whether consecutive sentences were appropriate, the trial court found that the Defendant's record of criminal activity is extensive. The Criminal Sentencing Reform Act of 1989 provides that a trial court may impose consecutive service if it finds by a preponderance of the evidence that a "defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2) (2006). In addition to this criterion, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002); see also Tenn. Code Ann. §§ 40-35-102(1), -103(2) (2006); In re Sneed, 302 S.W.3d 825, 828-29 (Tenn. 2010). The determination of whether to impose consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b) is "a matter addressed to the sound discretion of the trial court." State v. Hastings, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999).

In this case, the trial court's findings regarding consecutive sentencing are supported by the record. The presentence report reflects that the Defendant's record of criminal activity is extensive. This Court has held that "[e]xtensive criminal history alone will support consecutive sentencing." See State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (citing State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994)); see also State v. Gann, 251 S.W.3d 446, 464 (Tenn. Crim. App. 2007). Specifically, according to the presentence report, the Defendant has more than thirty felony convictions, as well as numerous misdemeanor convictions. The trial court also found that the Defendant had committed offenses while on probation. This finding is supported by the presentence report as well.

Additionally, the Defendant's twenty-four year sentence is not "unduly harsh." The trial court found, with respect to consecutive sentencing, that the Defendant's "total effective sentence of twenty-four years reasonably relates to the severity of [the] offense. . . ." We agree with the trial court. The sentence delivered by the trial court was justly deserved in relation to the seriousness of the offense and no greater than deserved under the circumstances. As discussed by the trial court, the facts surrounding the thefts in this case, the Defendant's prior criminal history, and the fact that the Defendant previously has reoffended while being released on probation all reflect a poor chance of rehabilitation. See, e.g., State v. Thomas, No. W2011-02310-CCA-R3-CD, 2012 WL 2112413, at *6 (Tenn. Crim. App. June 12, 2012) (discussing the defendant's poor chance of rehabilitation in concluding consecutive sentencing is appropriate); State v. Holden, No. M2006-01447-CCA-R3-CD, 2007 WL 258434, at *4 (Tenn. Crim. App. Jan. 30, 2007) (concluding "that the trial court's imposition of consecutive sentences was obviously based upon the [d]efendant's continuous and ongoing criminal activity. The record clearly supports this finding and the inference that the [d]efendant is a poor candidate for rehabilitative efforts."); State v. Earls, No. M2001-00112-CCA-R3-CD, 2002 WL 1586286, at *2 (Tenn. Crim. App. July 18, 2002) (discussing the defendant's "very little possibility" of rehabilitation due to his "extensive criminal record" in upholding consecutive sentencing). Further, the fact that well over twenty of the Defendant's prior felony convictions involve theft of property over $1,000 or auto burglary, coupled with the fact that there is no indication from the record of any history of lawful employment,[13] also support the imposition of consecutive sentences. See, e.g., Holden, 2007 WL 258434, at *4 (discussing how the defendant relied on criminal activity as a major source of livelihood in affirming the trial court's imposition of consecutive sentencing based upon the defendant's extensive criminal record).

Accordingly, the Defendant is entitled to no relief on this issue.

---

[13] According to the presentence report, the Defendant did not report any history of employment on his questionnaire. The presentence report only lists employment from June 18, 1997, to November 1, 1997, which was previously recorded in "TOMIS" but was not verified.

## **Conclusion**

For the reasons set forth above, we affirm the judgments of the trial court.

_____

JEFFREY S. BIVINS, JUDGE